**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ROBERT STRINGER,          )
                           )     Civil Action No. 13 – 221
             Petitioner,   )
                           )
          v.             )     District Judge Terrence F. McVerry
                           )     Magistrate Judge Lisa Pupo Lenihan
LOUIS FOLINO and THE     )
ATTORNEY GENERAL OF THE  )
STATE OF PENNSYLVANIA,   )
                           )
             Respondents.  )

## REPORT AND RECOMMENDATION

**I.**    **RECOMMENDATION**

For the reasons that follow, it is respectfully recommended that the Petition for Writ of

Habeas Corpus (ECF No. 12) be denied and that a Certificate of Appealability also be denied.

**II.**    **REPORT**

Pending before the Court is a Petition for Writ of Habeas Corpus ("Petition") filed by

Robert Stringer ("Petitioner" or "Stringer" or "defendant" or "appellant") pursuant to 28 U.S.C.

§ 2254. Petitioner challenges his judgment of sentence for first degree murder and related crimes

at Allegheny County Court of Common Pleas CC Nos. 200401070 and 200402866. For the

following reasons, the Petition should be denied.

**A.**    **Facts of the Crime**

The facts of the crime, as set forth by Judge Cashman in his Pa. R.A.P. 1925(b) Opinion

dated April 30, 2007, are as follows.

In January of 2004, Stringer was a twenty-year old, unemployed African-American with severe crack cocaine addiction. He was living in various residences in Charleroi, Pennsylvania. On January 6, 2004, Stringer met Joy Cochran, a twenty-seven year old, white female and the two of them took up residence at a hotel in Charleroi, Pennsylvania, so that they could party. Their concept of partying consisted of drinking alcohol and smoking crack cocaine, in addition to having sexual relations. After several days of partying, they had run out of both crack cocaine and money so they decided that they would drive to Pittsburgh in the hopes of obtaining crack cocaine and more money to buy the crack cocaine.

On January 11, 2004, Cochran's nephew drove them to Stringer's sister's residence, an apartment in the East Hills section of Pittsburgh. Stringer told Cochran that he wanted to go to Homewood to rip off a drug dealer so that he could get some crack cocaine but Cochran told him that she was scared to do that, so that plan was abandoned. Stringer next suggested that they could go to the Giant Eagle and carjack somebody in the parking lot. Again, Cochran rejected that plan as being too dangerous. Stringer then told her that he was going down to the Giant Eagle and he would be back shortly. Approximately twenty minutes to one-half hour later, Cochran heard a horn blow outside Stringer's sister's apartment and when she looked out the window, she saw Stringer waving and motioning for her to come and get in the car. Cochran got into the back seat of the car and noticed that Stringer was driving the car and that an unknown older white male was sitting in the front passenger seat.

After Cochran got into the car, Stringer told them that they were going to a MAC machine and asked the front seat passenger for his ATM card, which he turned over to Stringer. Stringer, in turn, gave the card to Cochran and demanded that she get as much money as she could. Cochran told Stringer that she did not know the appropriate PIN number to allow these transactions and Stringer then asked the front seat passenger what the PIN number was and he supplied that number. Cochran, on her first attempt, received two hundred and twenty dollars which she pocketed since she was afraid that Stringer might abandon her in Pittsburgh and she would have no way to get back to Charleroi. On the second attempt, she received two hundred dollars; however, when she attempted to get another two hundred dollars, the machine would not authorize that transaction. Cochran gave Stringer two hundred dollars and the ATM card, which card Stringer gave to the front seat passenger. After Cochran got into the car, Stringer said that they were going back to his sister's house but, instead of going to his sister's house, they went to a park and Stringer then told the front seat passenger to get out, which he did, and the two of them went to the back of the car and then went into the woods. Cochran stayed in the car and waited for approximately five to ten minutes when Stringer finally got back in the car. Cochran asked Stringer where the other guy was and Stringer replied only that he had stayed in the park.

Stringer and Cochran then went back to Stringer's sister's house and he gave her forty dollars since he owed that money to someone else. Stringer then got back into the car and proceeded to buy some gas, cigarettes and blunt wrappers. Stringer made a couple of phone calls on a cellular phone to arrange a meeting to purchase drugs. Stringer made a couple purchases of crack cocaine and then he and Cochran headed back to Charleroi. During the drive back to Charleroi, Stringer turned to her and told her that he had killed the guy and left him in the park. At that point Stringer handed her a Giant Eagle plastic bag that contained a knife. Cochran threw the bag and the knife out the window on their ride back to Charleroi. When they arrived back at Charleroi, they went to one of Stringer's uncle's homes, stayed there about twenty minutes and then got into an argument and Stringer pulled a gun, putting it to her head and told her to get out.

In the early evening of Sunday, January 11, 2004, Eileen Driscoll called her brother Daniel Lynch, to remind him that he had a surgical procedure scheduled at Mercy Hospital at 11:00 the following morning. Since this procedure would require anesthesia, she had agreed that she would drive him home. Mrs. Driscoll was unable to reach her brother; however, [she] did leave a message on his answering machine. Daniel Lynch was a fifty-nine year old Caucasian who had worked for thirty-five years at Mellon Bank [and] had been promoted to vice president. In addition to his regular employment, Lynch had an antique business with William McAffey, who was not only his business partner but, also, his life partner for more than twenty years. Daniel Lynch had gone out of town during the weekend of January 9 through the 11, 2004, apparently to look for additional antiques for his business.

On January 12, 2004, Lynch did not report to work nor did he make his appointment for his surgery at Mercy Hospital. His sister and brother-in-law then contacted the Wilkinsburg Police, asking if they would check his residence. When the police went to that residence, there was no sign of obvious entry; however, there was a back door to the residence that was slightly ajar. There was nothing missing in the residence that could be gleaned from an initial inspection and when William McAffee confirmed later that day that he had not seen nor heard from Lynch, a missing persons report was filed. In addition, a BOLO report was put out on Lynch's automobile, a copper-colored Pontiac Aztec.

Mellon Bank Security then began its own investigation since Lynch had a number of accounts at Mellon Bank, in addition to having an ATM card. Mellon also contacted Citizens Bank and PNC Bank and came up with the information that Lynch's card had been used at 9:07 p.m. to make a small twenty dollar purchase and at 9:51 p.m., 9:52 p.m. and 9:53 p.m., transactions with respect to the amounts of two hundred twenty dollars, two hundred dollars, and two hundred dollars were made or attempted to be made. Surveillance photographs with respect to those ATM transactions revealed a white female with a hoodie as the individual who was withdrawing or attempting to withdraw the money.

Sprint was the service provider for Lynch's cellular phone and an emergency request was made for information concerning any calls that were made to or from that phone. Sprint provided the records to the police and two telephone numbers located in Charleroi, Pennsylvania, appeared to have been repeatedly called after January 11, 2004. One of the two phone numbers was registered to Robert Kalbaugh, who lived in the Charleroi area and the other was to Frances Savko, who also lived in Charleroi. Allegheny County homicide detectives then went to the residence of Mr. Kalbaugh to inquire as to whether or not he had received any phone calls that were being made from Daniel Lynch's phone. Mr. Kalbaugh informed the detectives that he was a jitney driver and that he had received a phone call from Bridget Wallace requesting a ride.

After talking to Mr. Kalbaugh, the detectives then went to the residence of Kevin Savko and as they pulled up to his house, they noticed Lynch's copper Pontiac Aztec automobile parked in front of that house. Just then Kevin Savko and Jennifer Patterson were walking toward the vehicle and the detectives, after introducing themselves, asked them who had the car. Jennifer Patterson indicated that she had the keys to the car since she had obtained the car from Stringer in exchange for some crack cocaine. Patterson also indicated that she had made several phone calls on a cell phone that Stringer was using. After learning that Stringer and Bridget Wallace had dated for a period of time, the detectives attempted to find Bridget Wallace. When the police located Wallace, she informed the detectives that although she had been with Stringer, he was not with her now but she could contact him and tell him to contact the police. Several hours later, Bridget Wallace contacted the detectives and informed them that Stringer was at his residence and the police went to that residence to talk to Stringer about Lynch's murder.

Detectives took Stringer to the local police department so that they could interview him with respect to what, if any, knowledge he had regarding Lynch's murder. During the course of that interview, Stringer provided the detectives with five different stories. In the first version, Stringer indicated that he had no knowledge of Lynch's death and that he believed that Lynch's car was, in fact, Kevin Savko's car and that he had asked to buy it. In addition, he said that he bought the cellular telephone that he was using from Savko for sixty dollars. Several more versions were given during which Stringer['s] involvement in these crimes became more apparent. In Stringer's last version of what happened on January 11, 2004, he admitted that he was with Joy Cochran and they decided to rob somebody and that is when they took possession of Lynch's car, Lynch and his credit cards. After making withdrawals from the ATM machine, they went to a wooded area in Penn Hills where Stringer told Lynch to get out of the car and walked him into the woods and then slit his throat and stabbed him in the back.

After arresting Stringer for the murder of Daniel Lynch, the detectives then sought out Joy Cochran, as they believed that she was Stringer's accomplice. Cochran told the police that Stringer had suggested that they rob somebody and that they were going to target somebody at a Giant Eagle. She confirmed the remaining portions of Stringer's last statement with the exception of how Lynch was murdered since she maintained that she never left the car after making the ATM transactions on Lynch's credit card.

(Resp's Ex. 13, ECF No. 31-5 at pp.3-9.)[1]

## B.   Relevant Procedural Background[2]

Petitioner was charged by Criminal Information filed in the Court of Common Pleas of Allegheny County, Criminal Division. At CC 200401070, Petitioner was charged with one count of Criminal Homicide.[3] (Resp't Exs. 1, 2; ECF No. 31-1 at pp.1-26.) At CC 200402866, Petitioner was charged with one count each of Kidnapping,[4] Robbery,[5] Robbery of a Motor Vehicle,[6] Criminal Conspiracy,[7] Theft by Unlawful Taking,[8] Receiving Stolen Property,[9] and Access Device Fraud.[10] (Resp't Ex. 3, 4; ECF No. 31-2 at pp.1-24.)

---

[1] A list of Respondents' exhibits and their corresponding page numbers are docketed at ECF No. 31 at pp.2-6. The exhibits will be referred to herein by their exhibit number and corresponding ECF number.

[2] The Court adopts the Respondents' summary of the relevant procedural history of this case, which is briefed at pp.1-22 in their Answer. (ECF No. 30 at pp.1-22.)

[3] 18 Pa. C.S.A. § 2501(a)

[4] 18 Pa. C.S.A. § 2901(a)

[5] 18 Pa. C.S.A. § 3701(a)(1)(i)&(ii)

[6] 18 Pa. C.S.A. § 3702

[7] 18 Pa. C.S.A. § 903(a)(1)

[8] 18 Pa. C.S.A. § 3921(a)

[9] 18 Pa. C.S.A. § 3925

On March 18, 2004, counsel for Petitioner, Attorney Patrick E. Sweeney of the Office of Public Defender, filed a Motion for Discovery. (Resp't Ex. 5; ECF No. 31-3 at pp.1-5.) On January 6, 2005, Attorney Sweeney moved to withdraw as counsel, and, on January 20, 2005, Attorney Thomas N. Farrell was appointed to represent Petitioner.

On January 31, 2005, Petitioner appeared before the Honorable David R. Cashman for a Habeas Corpus hearing. Petitioner was represented at the hearing by Attorney Farrell and Assistant District Attorney Stephi-Anna Kapourales represented the Commonwealth.

On February 1, 2005, Judge Cashman denied the motion.

On March 10, 2005, Petitioner, through Attorney Farrell, filed a Motion for Psychiatric Expert. (Resp't Ex. 6; ECF No. 31-3 at pp.6-10.) On March 22, 2005, Dr. Horacio Fabrega was appointed as a psychiatric expert. (Resp't Ex. 7; ECF No. 31-3 at p11.)

On May 23, 2005, the Commonwealth, through Assistant District Attorney Stephie-Anna Kapourales, filed a Motion for Psychiatric Physician Visitation requesting that Dr. Bruce Wright be allowed unlimited contact visitations with Petitioner, and the motion was granted that same day. (Resp't Ex. 8; ECF No. 31-3 at pp.12-16.)

On May 26, 2005, Petitioner, through Attorney Farrell, filed an Omnibus Pretrial Motion. (Resp't Ex. 9; ECF No. 31-3 at pp.17-25.) In the Motion to Suppress, Petitioner sought to suppress a statement he made to co-defendant Joy Cochran, who, he contended, had been acting as an agent of the Commonwealth at the time the statement was made. In the Motion in Limine, Petitioner sought to exclude his statement to Cochran, exclude his juvenile record, and exclude

---

[10] 18 Pa. C.S.A. § 4106(a)(1)&(c)

his prior convictions. In the Motion to Compel Discovery, Petitioner sought the notes of the police officers who had interviewed him.

On June 1, 2005, Petitioner, through Attorney Farrell, filed a Motion to Appoint Investigator Neil Mauro, which was granted that same day. (Resp't Ex. 10; ECF No. 31-3 at pp.26-30.)

On June 6, 2005, Petitioner appeared for a hearing before Judge Cashman. After the hearing, Petitioner's Motion to Suppress was denied and the case proceeded to a jury trial.

On June 13, 2005, the jury found Petitioner guilty as charged at CC 200402866 and guilty of First Degree Murder at CC 200401070. Sentencing was deferred pending a presentence report.

On September 1, 2005, Petitioner appeared before Judge Cashman for sentencing. Petitioner was represented by Attorney Farrell and the Commonwealth was represented by Assistant District Attorney Kapourales. At CC 20040170, Count 1, First Degree Murder, Petitioner was sentenced to life imprisonment. At CC 200402866, Count 1, Kidnapping, Petitioner was sentenced to a term of incarceration of not less than ten (10) years nor more than twenty (20) years consecutive to the sentenced imposed at CC 200402866. At Count 2, Robbery, Petitioner was sentenced to a term of incarceration of not less than ten (10) years nor more than twenty (20) years concurrent to the sentence imposed at Count 1. At Count 3, Robbery of a Motor Vehicle, Petitioner was sentenced to a term of incarceration of not less than ten (10) years nor more than twenty (20) years concurrent to Count 2. At Count 4, Criminal Conspiracy, Petitioner was sentenced to a term of incarceration of not less than ten (10) years nor more than twenty (20) years concurrent to Count 3. No further penalty was imposed at the remaining counts.

On September 19, 2005, Petitioner, through Attorney Farrell, filed a Notice of Appeal. (Resp't Ex. 11; ECF No. 31-4 at pp.1-23.) On October 13, 2005, he filed a Concise Statement of Matters Complained of on Appeal. (Resp't Ex. 12; ECF No. 31-4 at pp.24-27.) On April 30, 2007, Judge Cashman filed his Opinion pursuant to Pa. R.A.P. 1925(a). (Resp't Ex. 13; ECF No. 31-5 at pp.1-20.)

On June 27, 2007, Petitioner, through Attorney Nicole T. Wetherton, filed a Brief for Appellant in the Superior Court of Pennsylvania, which was docketed at No. 1667 WDA 2005. (Resp't Exs. 14, 15; ECF Nos. 31-5 at pp.21-25, 31-6, 31-7.) The Commonwealth filed their Brief for Appellee on July 24, 2007. (Resp't Ex. 16; ECF No. 31-8.) A Reply Brief for Appellant was filed on November 15, 2007. (Resp't Ex. 17; ECF No. 32-1 at pp.1-11.) On May 23, 2008, the Superior Court affirmed Petitioner's judgment of sentence. (Resp't Ex. 18; ECF No. 32-1 at pp.12-25.)

On June 5, 2008, Petitioner, through Attorney Farrell, filed a Petition for Allowance of Appeal in the Supreme Court of Pennsylvania, which was docketed at No. 281 WAL 2008. (Resp't Exs. 19, 20; ECF Nos. 32-1 at pp.26-28, 32-2, 32-3.) The Commonwealth filed a "No Answer Letter" on June 10, 2008. (Resp't Ex. 21; ECF No. 32-4 at p.1.) On October 23, 2008, the Supreme Court denied the petition. (Resp't Ex. 22; ECF No. 32-4 at p.2.)

On April 20, 2009, Petitioner filed his first *pro se* petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"). (Resp't Ex. 23; ECF Nos, 32-5, 32-6.) On October 28, 2009, Judge Cashman appointed Attorney Charles R. Pass, III to represent Petitioner in his PCRA proceedings.

On December 7, 2009, Attorney Pass filed a Motion for Leave to Withdraw as Counsel pursuant to Commonwealth v. Turner, 544 A.2d 927 (Pa. 1988), and Commonwealth v. Finley,

550 A.2d 213 (Pa. Super. 1988) (*en banc*), ("No-Merit Letter"), and a Brief in Support thereof. (Resp't Ex. 24; ECF Nos. 33-1 – 33-8.)  Thereafter, Petitioner filed a *pro se* petition for leave to amend his PCRA petition and Objections to the No-Merit Letter.  (Resp't Ex. 25; ECF No. 34-1 at pp.1-3.)  On February 2, 2010, Attorney Pass filed a Supplement to his Motion for Leave to Withdraw as Counsel.  (Resp't Ex. 26; ECF No. 34-1 at pp.4-14.)  On February 3, 2010, Judge Cashman issued a Notice of Intent to Dismiss the PCRA Petition Pursuant to Pa.R.Crim.P. 907. (Resp't Ex. 27; ECF No. 34-1 at pp.15-16.)  On February 12, 2010, Attorney Pass filed a Motion to Withdraw his appearance as counsel.  (Resp't Ex. 28; ECF No. 34-1 at pp.17-20.)  On March 9, 2010, Petitioner filed a *pro se* Response to the Court's Notice of Intent to Dismiss the PCRA petition.  (Resp't Ex. 29; ECF No. 34-1 at pp.21-36.)  On July 12, 2010, Judge Cashman dismissed the PCRA petition.  (Resp't Ex. 30; ECF No. 34-1 at p.37.)

On August 5, 2010, Petitioner filed a *pro se* Notice of Appeal.  (Resp't Ex. 31; ECF No. 34-1 at pp.38-40.)  On September 15, 2010, Petitioner filed a *pro se* Concise Statement of Matters Complained of on Appeal.  (Resp't Ex. 32; ECF No. 34-1 at pp.41-43.)  On September 23, 2010, Petitioner filed a *pro se* Amended Concise Statement of Matters Complained of on Appeal.  (Resp't Ex. 33; ECF No. 34-1 at pp.44-46.)  On July 6, 2011, Judge Cashman filed his Opinion pursuant to Pa. R.A.P. 1925(a).  (Resp't Ex. 34; ECF No. 34-2 at pp.1-28.)

On September 26, 2011, Petitioner filed a *pro se* Brief for Appellant in the Superior Court of Pennsylvania, which was docketed at No. 1358 WDA 2010.  (Resp't Exs. 35, 36; ECF Nos. 34-2 at pp.29-32, 34-3, 34-4.)  The Commonwealth filed a Brief for Appellee on October 19, 2011.  (Resp't Ex. 37; ECF No. 34-5.)  On October 26, 2011, Petitioner filed a *pro se* Reply Brief for Appellant.  (Resp't Ex. 38; ECF No. 34-6 at pp.1-12.)  In an Opinion issued on December 28, 2011, the Superior Court affirmed the judgment of the PCRA court.  (Resp't Ex.

9

39; ECF No. 34-6 at pp.13-26.) On January 8, 2012, Petitioner filed a *pro se* Application for Panel Reconsideration/Reargument, En Banc. (Resp't Ex. 40; ECF Nos. 34-7, 34-8.) On March 2, 2012, the Superior Court denied the application. (Resp't Ex. 41; ECF No. 35-1 at p.1.)

On March 30, 2012, Petitioner filed a *pro se* Petition for Allowance of Appeal in the Supreme Court of Pennsylvania, which was docketed at No. 143 WAL 2012. (Resp't Exs. 42, 43; ECF Nos. 35-1 at p.2-4, 35-2, 35-3.) The Supreme Court denied the petition on August 22, 2012. (Resp't Ex. 44; ECF No. 35-4 at p.1.)

On July 26, 2012, Petitioner filed a second *pro se* PCRA petition claiming that Miller v. Alabama, 132 S. Ct. 2455 (2012), warranted reversal of his sentence. (Resp't Ex. 45; ECF No. 35-4 at pp.2-8.) On August 13, 2012, Judge Cashman issued a Notice of Intent to Dismiss stating that Miller did not apply as Petitioner was twenty years old at the time of his offenses, and, therefore, his second PCRA petition was untimely. (Resp't Ex. 46; ECF No. 35-4 at p.9.) On August 30, 2012, Petitioner filed a *pro se* Response to the Court's Notice of Intent to Dismiss the PCRA petition. (Resp't Ex. 47; ECF No. 35-4 at pp.10-12.) On October 1, 2012, Judge Cashman issued an order dismissing the second PCRA petition. (Resp't Ex. 48; ECF No. 35-4 at p13.)

On October 10, 2012, Petitioner filed a *pro se* Notice of Appeal. (Resp't Ex. 49; ECF No. 35-4 at pp.14-15.) On December 27, 2012, Petitioner filed a *pro se* Concise Statement of Matters Complained of on Appeal. (Resp't Ex. 50; ECF No. 35-4 at pp.16-19.)

On December 18, 2012, Petitioner filed a third *pro se* PCRA petition. (Resp't Ex. 51; ECF No. 35-4 at pp.20-27.) On January 2, 2013, Petitioner filed a *pro se* Memorandum of Law for PCRA Petition. (Resp't Ex. 52; ECF Nos. 35-5, 35-6.) On January 14, 2013, Judge Cashman denied the petition for lack of jurisdiction. (Resp't Ex. 53; ECF No. 35-7 at p.1.)

On February 15, 2013, Judge Cashman filed his Pa. R.A.P. 1925(a) Opinion in regards to Petitioner's appeal of his second PCRA petition. (Resp't Ex. 54; ECF No. 35-7 at pp.2-17.) On May 1, 2013, Petitioner filed a *pro se* Brief for Appellant in the Superior Court of Pennsylvania, which was docketed at No. 1726 WDA 2012. (Resp't Exs. 55, 56; ECF Nos. 35-7 at pp.18-21, 35-8.) The Commonwealth filed a Brief for Appellee on June 4, 2013. (Resp't Ex. 57; ECF No. 36-1.) On October 9, 2013, the Superior Court affirmed the judgment of the PCRA court. (Resp't Ex. 58; ECF No. 36-2 at pp.1-5.) On October 22, 2014, Petitioner filed a *pro se* Application for Panel Reconsideration/Reargument, En Banc, which the Superior Court denied on December 6, 2013. (Resp't Ex. 59; ECF No. 36-2 at p.6.) Petitioner did not file a Petition for Allowance of Appeal in the Supreme Court of Pennsylvania.

Meanwhile, on July 25, 2013, Petitioner filed a *pro se* Truth Affidavit. (Resp't Ex. 60; ECF No. 36-2 at pp.7-10.) On August 6, 2013, Petitioner filed a *pro se* Notice of Default Opportunity to Cure. (Resp't Ex. 61; ECF No. 36-2 at pp.11-13.) On August 13, 2014, Petitioner filed a *pro se* Notice of Default. (Resp't Ex. 62; ECF No. 36-2 at pp.14-15.) On September 6, 2013, Petitioner filed a *pro se* Petition for Writ of Habeas Corpus *ad-subjiciendum* in the Court of Common Pleas of Allegheny County, Civil Division, which was docketed at GD 13-16417. (Resp't Ex. 63; ECF No. 36-2 at pp.16-27.) On September 3, 2013, Petitioner filed a *pro se* Notice of Entry of Final Judgment. (Resp't Ex. 64; ECF No. 36-2 at pp.28-29.) On September 14, 2013, Petitioner filed a *pro se* Memorandum of Law for Writ of Habeas Corpus *ad-subjiciendum*. (Resp't Ex. 65; ECF Nos. 36-3, 36-4.) On September 23, 2013, the Honorable W. Terrence O'Brien transferred the case to the Criminal Division of the Court of Common Pleas. (Resp't Ex. 66; ECF No. 36-5 at p.1.) On September 24, 2013, Petitioner filed a *pro se*

Notice of Civil Division Jurisdiction and a *pro se* Amended Petition for Writ of Habeas Corpus *ad-subjiciendum*. (Resp't Ex. 67; ECF No. 36-5 at pp.2-9.)

On September 25, 2013, Judge Cashman entered an Order correcting the sentencing order to refer to the proper statutory authority. (Resp't Ex. 68; ECF No. 36-5 at p.10.) On September 26, 2013, Judge Cashman dismissed Petition for Writ of Habeas Corpus *ad-subjiciendum* for lack of jurisdiction. (Resp't Ex. 69; ECF No. 36-5 at p.11.)

On September 26, 2013, Petitioner filed a *pro se* Petition to Rectify Constitutional Violations. (Resp't Ex. 70; ECF No. 36-5 at pp.12-20.) On October 1, 2013, Petitioner filed a second *pro se* Petition to Rectify Constitutional Violation(s) of Due Process Rights. (Resp't Ex. 71; ECF No. 36-5 at pp.21-23.) On October 1, 2013, Petitioner filed a *pro se* Notice of Appeal of the denial of his Petition for Writ of Habeas Corpus *ad-subjiciendum*. (Resp't Ex. 72; ECF No. 36-5 at pp.24-27.) On November 4, 2013, Petitioner filed two *pro se* Concise Statements of Matters Complained of on Appeal. (Resp't Exs. 73, 74; ECF No. 36-5 at pp.28-32.)

Petitioner's appeal was docketed in the Superior Court of Pennsylvania at No. 1705 WDA 2013 and 1706 WDA 2013. (Resp't Exs. 75, 76; ECF No. 36-5 at pp.33-37.) On March 17, 2014, Petitioner filed a *pro se* Praecipe for Discontinuance, which was granted discontinuing the appeal. (Resp't Ex. 77; ECF No. 36-5 at p.38.)

Also during this time, on October 23, 2013, Petitioner filed another *pro se* Petition for Writ of Habeas Corpus *ad-subjiciendum* and a Memorandum of Law for Writ of Habeas Corpus *ad-subjiciendum* in the Court of Common Pleas of Greene County, which was docketed at No. 813 A.D. of 2013. (Resp't Ex. 78; ECF No. 36-6 at pp.1-9.) On November 8, 2013, Petitioner filed another *pro se* Memorandum of Law for Writ of Habeas Corpus *ad-subjiciendum*. (Resp't Ex. 79; ECF No. 36-6 at pp.10-33.) On December 10, 2013, Petitioner filed a *pro se* Motion for

Default Judgment and Motion for Emergency Relief. (Resp't Ex. 80; ECF No. 36-7 at pp.1-8.)

On December 11, 2013, Petitioner filed a *pro se* Request for Jury Demand. (Resp't Ex. 81; ECF No. 36-7 at pp.9-10.) On December 18, 2013, the Honorable Farley Toothman entered an order directing the Commonwealth to file a response. (Resp't Ex. 82; ECF No. 36-7 at p.11.) On December 24, 2013, the Office of the General Counsel informed the Court that the Office of the District Attorney of Allegheny County was handling the case. (Resp't Ex. 83; ECF No. 36-7 at pp.12-13.) On December 27, 2013, Petitioner filed a *pro se* Motion for Settlement and Motion for Acceptance to Terms of Settlement. (Resp't Ex. 84; ECF No. 36-7 at pp.14-20.) On December 30, 2013, Judge Toothman denied Petitioner's Motion for Settlement. (Resp't Ex. 85; ECF No. 36-7 at p.21.) On January 2, 2014, Judge Toothman transferred the case back to Allegheny County. (Resp't Ex. 86; ECF No. 36-7 at p.22.) On January 7, 2014, Petitioner filed another *pro se* Petition to Rectify Constitutional Violations. (Resp't Ex. 87; ECF No. 36-7 at pp.23-34.)

On February 4, 2014, Petitioner filed a *pro se* Notice of Appeal, which appealed the transfer of Petitioner's case from Greene County to Allegheny County, and, on February 14, 2014, Judge Toothman filed his Pa. R.A.P. 1925(a) Opinion. (Resp't Ex. 88; ECF No. 36-7 at p.35.) On March 17, 2014, Petitioner filed a *pro se* Brief for Appellant in the Superior Court of Pennsylvania, which was docketed at No. 195 WDA 2014. (Resp't Exs. 89, 90; ECF Nos. 36-7 at pp.36-38, 36-8.) The Superior Court affirmed on February 20, 2015.[11]

On May 27, 2015, Petitioner filed another Petition for Writ of Habeas Corpus *ad-sujecieum* in his criminal case. Judge Cashman entered a Notice of Intent to Dismiss the Petition

---

[11] Petitioner's appellate docket sheet at No. 195 WDA 2014 is available online at https://ujsportal.pacourts.us.

on June 17, 2015.  Petitioner filed a Response to the Notice, but the PCRA petition was dismissed on August 17, 2015.  Petitioner filed a Notice of Appeal on September 2, 2015.  This appeal was docketed at 1435 WDA 2015.  As of today, this appeal is still pending.

Petitioner filed a fourth *pro se* PCRA petition on September 9, 2015, which was dismissed by Judge Cashman on October 15, 2015.

Petitioner initiated this habeas corpus proceeding on February 11, 2013.  (ECF No. 1.) At the request of Petitioner, this case was stayed pending resolution of Petitioner's second PCRA proceedings.  (ECF Nos. 6, 8.)  On January 9, 2014, this case was reopened.  (ECF No. 9; Text Order dated Jan. 9, 2014.)  Petitioner filed a *pro se* Memorandum of Law in Support of Petition for a Writ of Habeas Corpus on February 20, 2014, (ECF No. 13), and he filed a supplement to his Petition on March 31, 2014, (ECF No. 14).  Respondents filed their Answer to the Petition on May 14, 2014.  (ECF Nos. 30-36.)  Petitioner filed yet another supplement to his Petition on October 3, 2014, (ECF No. 44), which Respondents answered on October 8, 2014, (ECF No. 45).

### C.  Habeas Standard

Where the state courts have reviewed a federal issue presented to them and disposed of the issue on the merits, AEDPA provides the applicable deferential standards by which the federal habeas court is to review the state court's disposition of that issue.  *See* 28 U.S.C. § 2254(d) and (e).  In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court expounded upon the standard found in 28 U.S.C. § 2254(d).  In Williams, the Court explained that Congress intended that habeas relief for errors of law may only be granted in two situations: (1) where the State court decision was "contrary to . . . clearly established Federal law as determined by the Supreme Court of the United States" or (2) where the State court decision "involved an unreasonable application of[] clearly established Federal law as determined by the Supreme

14

Court of the United States." Id. at 404-05. The Court explained the two situations in the following terms:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-13. The Court of Appeals for the Third Circuit has also elucidated the "contrary to" clause by noting that "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome." Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000) (quoting Matteo v. Superintendent, SCI-Albion, 171 F.3d 877, 888 (3d Cir. 1999) (*en banc*)). Moreover, the "unreasonable application" test is an objective one; "a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." Jacobs v. Horn, 392 F.3d 92, 100 (3d Cir. 2005) (citation omitted). It is Petitioner's burden to prove the State court decision is either contrary to or an unreasonable application of clearly established Federal law. *See* Matteo, 171 F.3d at 888; Werts, 228 F.3d at 197.

AEDPA also permits federal habeas relief where the State court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Section 2254(d)(2) mandates the federal habeas court to assess whether the state court's determination was reasonable or unreasonable given that evidence. If the state court's decision based on such a determination is unreasonable in light of the evidence presented in the state court proceeding,

15

habeas relief is warranted. Within this overarching standard, of course, a petitioner may attack specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision. Here, section 2254(e)(1) comes into play, instructing that the state court's determination must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence. Lambert v. Blackwell, 387 F.3d 210, 235 (3d Cir. 2004).

### D. Discussion

#### 1. Voluntary Manslaughter Instruction

In claim 1(a), Petitioner claims that he was denied his right to a fair trial because the trial court failed to instruct the jury on voluntary manslaughter. In claim 2(a), Petitioner claims that his trial counsel was ineffective for failing to object to the denial of the jury instruction.

Petitioner maintains that the trial court refused to instruct the jury on the charge of voluntary manslaughter as to both heat of passion and an unjustifiable belief of a right of self-defense. The predicate for these arguments is that Petitioner presented testimony through his psychiatrist that as a young boy he had been sodomized and that when he went into the woods with Mr. Lynch, Lynch, who was a homosexual, told him that he wanted to engage in sex with Petitioner which caused Petitioner to flash back to the time that he was sodomized in his youth and then, in turn, caused him to cut Lynch's throat and stab him in the back.

In addressing this claim in his Pa. R.A.P. 1925(a) Opinion, Judge Cashman found as follows:

> In this case there was no evidence which would support the charge of voluntary manslaughter. The evidence presented at the time of trial indicated that Stringer kidnapped Lynch, took his car, his cell phone, extorted money from Lynch and then took him into the woods for the purpose of killing him. At no time did Stringer suggest that he was the subject of a homosexual advance other than in his discussions with his psychiatrist. These discussions constitute the sixth different version that Stringer recalls on the evening of January 11, 2004. In

another of his versions he stated to Cochran that he took Ecstasy and did not remember anything that took place following the ingestion of that drug. When all of the testimony is examined, it is clear that there was no rational basis for the jury to be instructed on the crime of voluntary manslaughter since Stringer could not establish either a situation giving rise to the heat of passion nor an unjustifiable belief of a right of self-defense. Lynch's throat was brutally slashed from behind and he was stabbed several times in the back. The manner in which he was killed demonstrates a specific intent to kill consistent with his conviction for first-degree murder and inconsistent with any claim that the crime was voluntary manslaughter.

(Resp.'t Ex. 13, ECF No. 31-5 at pp.19-20.) On appeal, the Pennsylvania Superior Court found

as follows:

[U]nder any reading of the evidence, there was no basis for finding Appellant guilty of voluntary manslaughter. Even viewing, as we must, Appellant's claim in the light most favorable to Appellant that he thought the victim's statement was a sexual advance, the remaining evidence fails to establish that Appellant was protecting himself against the use of unlawful force or that he was free from fault in provoking or continuing the difficulty which resulted in the killing. Instantly, there was no evidence presented that the victim was armed or in any other manner capable of physically imposing his will upon the Appellant. Rather, the evidence showed that Appellant abducted the victim and robbed him. There simply was no honest but unreasonable belief that it was necessary to use deadly force to defend himself against the sexual advances of an unarmed five foot seven inch tall and 152 pound 59-year-old man. Furthermore, if Appellant believed the victim desired to engage in a sex act nothing prevented him from leaving the scene. Accordingly, we find that the trial court did not abuse its discretion in refusing to give the requested instruction.

(Rep's Ex. 18, ECF No. 32-1 at pp.22-23.)

Under Pennsylvania law, voluntary manslaughter occurs in two circumstances. The first

is when a person kills another without lawful justification "if at the time of the killing he is

acting under a sudden and intense passion resulting from serious provocation" by the person

killed. 18 Pa. C.S. § 2503(a). The second is when a person "intentionally or knowingly kills an

individual . . . if at the time of the killing he believes the circumstances to be such that, if they

existed, would justify the killing . . ., but his belief is unreasonable." 18 Pa. C.S. § 2503(b).

The Pennsylvania Supreme Court has explicitly stated that "[a] trial court should only instruct on an offense where the offense has been made an issue in the case and where the evidence would reasonably support such a verdict." Commonwealth v. Thomas, 717 A.2d 468, 478 (1998) (holding failure to instruct on voluntary manslaughter appropriate where no evidence existed to show that appellant killed the victim in a sudden and intense passion); *see also* Commonwealth v. Browdie, 671 A.2d 668 (1996) (affirming trial court's determination that defendant was not entitled to a voluntary manslaughter instruction when no evidence in the case supported such a verdict).

Initially, Petitioner's claim challenging the trial court's refusal to instruct the jury on voluntary manslaughter fails because jury instructions are generally a matter of state law and "[f]ederal courts reviewing habeas claims cannot 'reexamine state court determinations on state law questions.'" Priester v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004) (quoting Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)). *See also* Johnson v. Rosemeyer, 117 F.3d 104, 109 (3d Cir. 1997) ("[W]e have stated that 'it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim. The federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.'") (quoting Geschwendt v. Ryan, 967 F.2d 877, 888–89 (3d Cir. 1992)). In this case, the Pennsylvania Superior Court determined that, *as a matter of state law*, there was no basis for finding Petitioner guilty of voluntary manslaughter and therefore the trial court did not abuse its discretion in failing to give the instruction.

Even if the state court was incorrect in its interpretation of Pennsylvania law, it is "only where a State court's interpretation of its own law appears to be an 'obvious subterfuge to evade consideration of a federal issue . . . will a federal court re-examine the State court's

determination." Hallowell v. Keve, 555 F.2d 103, 107 (3d Cir. 1977) (internal citations omitted). *See also* Real v. Shannon, 600 F.3d 302, 310 (3d Cir. 2010). Here, there is nothing in the record to suggest that the Superior Court attempted "to evade consideration of a federal issue," and therefore, this Court must accept the state court's conclusion that the trial court's refusal to give the voluntary manslaughter instruction was consistent with Pennsylvania law.

As for Petitioner's contention that the trial court's refusal to give the voluntary manslaughter instruction denied him his federal constitutional right to due process,[12] "due process does not require the giving of a jury instruction when such charge is not supported by the evidence." Balzic v. Henderson, 900 F.2d 534, 541 (2d Cir. 1990) (citing Hooper v. Evans, 456 U.S. 605, 611 (1982); Hallowell v. Keve, 555 F.2d 103, 107 (3d Cir 1977)). "Neither due process nor any other constitutional guarantee is offended by a trial judge's refusal to charge the jury on a matter not presented by the evidence." Hallowell, 555 F.2d at 107. Instead, "[h]abeas relief for a due process violation concerning an absent or defective jury instruction is available only when the absence of an instruction, or a defective instruction, infects the entire trial with unfairness." Real, 600 F.3d at 309 (3d Cir. 2010) (quoting Albrecht v. Horn, 485 F.3d 103, 129 (3d Cir. 2007)). Given the evidence presented against Petitioner at trial, and the lack of evidence presented to support a voluntary manslaughter verdict, it cannot be said that the absence of the

---

[12] Petitioner did not present this claim to the state courts as a violation of his federal constitutional rights. Thus, as it is presented to this Court, the claim is unexhausted and at this point procedurally defaulted. However, rather than engage in a lengthy analysis to determine whether Petitioner has adequately demonstrated sufficient cause and prejudice to excuse the procedural default, the Court will simply review the claim *de novo*. *See* Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009) (In instances where a state court has not adjudicated a claim on the merits, the deference normally required under § 2254 does not apply and the federal habeas court applies *do novo* review to pure legal questions and to mixed questions of law and fact.)

voluntary manslaughter instruction was so damaging so as to "infect[] the entire trial with unfairness." Real, 485 F.3d at 309.

Petitioner's related claim of ineffective assistance of counsel for failing to object to the trial court's denial of the voluntary manslaughter instruction on due process grounds does not provide Petitioner with relief either.[13]  First, Petitioner's trial counsel did object to the trial court's denial of the instruction.  While he did not specifically do so on due process grounds, the United States Supreme Court has never held that the Due Process Clause requires instructing the jury on a lesser included offense in a non-capital case.  See Beck v. Alabama, 477 U.S. 625, 638 n.14 (1980).  Instead, Pennsylvania, like a number of other states, requires a trial judge to instruct on a lesser included offense "where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict."  Commonwealth v. Browdie, 671 A.2d 668, 674 (1996).  The issue of whether the evidence in Petitioner's trial reasonably supported a voluntary manslaughter verdict was litigated on direct appeal and found insufficient to support the instruction.  As explained above, this Court cannot re-examine the state court's determination of a matter of state law.

Because Petitioner's claim is premised on the belief that he was constitutionally entitled to the voluntary manslaughter instruction pursuant to the Due Process Clause, and no such federal right exists, counsel was not ineffective for failing to object to the denial of the instruction on due process grounds.  Therefore, these claims do not entitle Petitioner to habeas relief.

---

[13] Because of what appear to be typos in the PCRA court's discussion on this claim in its Pa. R.A.P. 1925(a) Opinion, and because the Superior Court clearly misinterpreted this claim on appeal, the Court is uncertain whether this claim was properly exhausted.  For this reason, it is reviewed de novo.

## 2. **Other Crimes Evidence**

In claim 1(b), Petitioner claims that he was denied a fair trial because other crimes evidence was admitted in violation of Pennsylvania Rule of Evidence 404(b)(1). In claim 2(b), Petitioner claims that trial counsel was ineffective for failing to object to its introduction.

Petitioner did not present claim 1(b) to the state courts on direct appeal or in his state collateral review proceedings, and, for this reason, the claim is deemed unexhausted.[14] Additionally, the claim is procedurally defaulted because Petitioner would be without a state corrective process if he were required to go back and present this claim to the state courts.[15] At

---

[14] The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief. This "exhaustion" requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Cristin v. Brennan, 281 F.3d 404, 410 (3d Cir. 2002), quoting Coleman, 501 U.S. at 731. *See also* O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999). In order to exhaust a claim, a petitioner must "fairly present" it to each level of the state courts. Lines v. Larkins, 208 F.3d 153, 159 (3d Cir. 2000), citing 28 U.S.C. § 2254(b); O'Sullivan, 526 U.S. at 848. In Pennsylvania, this requirement means that a petitioner in a non-capital case must have presented every federal constitutional claim raised in his habeas petition to the Common Pleas Court and then the Superior Court either on direct or PCRA appeal. *See* Lambert v. Blackwell, 387 F.3d 210, 233-34 (3d Cir. 2004). The petitioner must demonstrate that he raised the claim in the proper state forums through the proper vehicle, not just that he raised a federal constitutional claim before a state court at some point. O'Sullivan, 526 U.S. at 845 (a petitioner must have presented a claim through the "established" means of presenting a claim in state court at the time); Ellison v. Rogers, 484 F.3d 658, 660-62 (3d Cir. 2007) (the petitioner's claims of ineffective assistance were not exhausted properly even though he had raised those claims on direct review, because state law required that ineffective assistance claims be raised in state post-conviction review, and the petitioner had not sought such review).

[15] If a petitioner has failed to properly exhaust his claim – for example, he failed to comply with a state procedural rule such as Pa. R.A.P. 302(a)'s waiver rule – and as a result the state court declined to adjudicate the claim on the merits, the claim is defaulted in federal habeas corpus under the procedural default doctrine. *See*, *e.g.*, Coleman, 501 U.S. at 730; O'Sullivan, 526 U.S.

this point in time the claim would be deemed waived under the PCRA, 42 Pa. C.S.A. § 9544(b), and/or barred by the one year statute of limitations under the PCRA, 42 Pa. C.S.A. § 9545(b). As such, it would be futile to require exhaustion.

However, even if the claim were not procedurally barred, it is not cognizable in a federal habeas corpus proceeding. The state court's decision regarding the admissibility of evidence under the Pennsylvania Rules of Evidence is unreviewable by this Court. *See* Estelle, 502 U.S. at 67-68 (federal courts may not "reexamine state court determinations on state-law questions"); Wells v. Pestock, 941 F.2d 253, 256 (3d Cir. 1991) ("Our review of a federal habeas corpus petition is limited to remedying deprivations of a petitioner's federal constitutional rights. We take no cognizance of non-constitutional harm to the defendant flowing from a state's violation of its own procedural rule, even if that rule is intended as a guide to implement a federal constitutional guarantee."). As such, it is not subject to habeas review.

With respect to claim 2(b), the PCRA court addressed it in its Pa. R.A.P. 1925(a) Opinion as follows:

> Although Stringer did not specify the other crimes or bad acts for which his trial counsel could have objected or requested a cautionary instruction, this Court believes that it is the testimony of his co-conspirator, Joy Cochran, which he finds to be offensive. In that regard, her testimony revealed that Stringer had

---

at 851-56 (Stevens, J. dissenting) (describing the history of the procedural default doctrine). The procedural default doctrine prohibits federal habeas courts from reviewing a state court decision involving a federal question if the state court decision is based on a rule of state law that is independent of the federal question and adequate to support the judgment. *See, e.g.*, Gray v. Netherland, 518 U.S. 152, 162 (1996); Coleman, 501 U.S. at 732.

State procedural grounds for denying a PCRA claim include, but are not limited to, the PCRA's timeliness requirement, 42 Pa.C.S. § 9545(b), failing to adequately develop the claim in one's briefing, Commonwealth v. Bracey, 795 A.2d 935, 940 n. 4 (Pa. 2001); Pa. R.A.P. 2116, 2119(a), and presenting claim on appeal without having presented it to the lower court, Commonwealth v. Wharton, 811 A.2d 978, 990 (Pa. 2002); Pa. R.A.P. 302(a).

been involved in a prior carjacking and robbery of a drug dealer and the drug activity in which both of them engaged. This testimony of their drug activity and the planning of the robbery was part of the history of Stringer's case and, also, presented information with respect to his motive to commit the crimes against his victim, David Lynch. . . .

The testimony presented at the time of trial revealed that Stringer and Cochran had been using drugs for several days and had run out of both drugs and money when they decided it was necessary to leave Washington, Pennsylvania and come to Pittsburgh, Pennsylvania for the purpose of obtaining more drugs and possibly for robbing a drug dealer to gain not only his drugs but, also, his money. This testimony presented the historical background of Stringer's case and also the motivation for committing the crimes that he did. This Court instructed the jury as to the limited purpose for which this testimony was given and for what purpose it could consider this testimony. Since a cautionary instruction was given, Stringer's trial counsel could not be ineffective for failing to request one and, similarly, the evidence of prior crimes or bad acts was admissible under the exception provided in Pennsylvania Rule of Evidence 404(b)(2) since it established the history and motivation of the commission of Stringer's crimes.

(Resp't Ex. 34, ECF No. 34-2 at pp.17-19) (internal citations omitted). On appeal, however,

Petitioner abandoned this claim. While he initially raised it in his Pa. R.A.P. 1925(b) Concise

Statement of Matters Complained of on Appeal, (Resp't Ex. 32, ECF No. 34-1 at pp.41-43), and

then subsequently in his Amended Concise Statement of Matters Complained of on Appeal,

(Resp't Ex. 33, ECF No. 34-1 at pp.44-46), he did not, however, present and argue the claim in

his Appellate Brief, (Resp't Ex. 36, ECF Nos. 34-3, 34-4). Consequently, this claim has not

been exhausted, and, for the reasons previously discussed, is now procedurally defaulted. *See*,

*supra*, nn.14, 15. *See*, *e.g.*, Charlton v. Wakefield, No. 07-200, 2010 U.S. Dist. LEXIS 17957,

2010 WL 724521 at *10 (W.D. Pa. March 1, 2010) (Although raised in his post-trial motion and

in his Rule 1925(b) Statement, petitioner's sufficiency of the evidence claim was not exhausted

and procedurally defaulted because he did not present it in his brief filed with the Superior Court

as required by Rules 2111 and 2116 of the Pennsylvania Rules of Appellate Procedure).

Petitioner's failure to properly raise and address this claim in his Appellate Brief in compliance with Pa. R.A.P. 2116(a)[16] precluded the Superior Court's review of the claim and constitutes a waiver under state law.  *See* <u>Commonwealth v. Einhorn</u>, 911 A.2d 960, 969 n.2 (Pa. Super. 2006) ("Because this particular claim was not included in his statement of questions in his brief, we are constrained to find it waived."); <u>Thomas v. Elash</u>, 781 A.2d 170, 176-77 (Pa. Super. 2001) ("Although Appellant may have preserved the issues raised in his post trial motions by mailing the motions within 10 days of the verdict, he has now waived those issues by failing to include them in his brief to this Court . . . . Having failed to properly raise and address the issues in his brief, Appellant has precluded our review of his substantive claims."); <u>Commonwealth v. Kittelberger</u>, 616 A.2d 1, 3 n.6 (Pa. Super. 1992) ("[T]his particular claim is waived because appellant failed to properly preserve it for appellate review by specifically including it in his statement of questions.")

As noted in footnote 15, *supra*, the doctrine of procedural default prohibits federal habeas courts from reviewing a state court decision involving a federal question if the state court decision is based on a rule of state law that is "independent" of the federal question and "adequate" to support the judgment.  *See*, *e.g.*, <u>Gray v. Netherland</u>, 518 U.S. 152, 162 (1996); <u>Coleman</u>, 501 U.S. at 732.  The Supreme Court has stated that a state rule of procedure is "independent" if it does not depend for its resolution on answering any federal constitutional question.  *See*, *e.g.*, <u>Ake v. Oklahoma</u>, 470 U.S. 68, 75 (1985).  That is the case here, Pennsylvania's rule of waiver for failing to raise an issue on appeal is "independent" of any federal law question.  *See*, *e.g.*, <u>DiVentura v. Stepniak</u>, No. 95-CV-0443, 1996 WL 107852, at *3

---

[16] Pa. R.A.P. 2116(a) mandates that an appellant must present all issues on appeal in the Statement of Questions Involved section of his brief.

(E.D. Pa. March 11, 1996) (finding state court's application of the waiver rule to be "independent" of federal law). The Supreme Court has also stated that a state rule is "adequate" if it is "firmly established and regularly followed" at the time that the alleged procedural default occurred. Ford v. Georgia, 498 U.S. 411, 423-24 (1991); *see also* Nara v. Frank, 488 F.3d 187, 199 (3d Cir. 2007) (a state rule is adequate when a state appellate court reviewing the petitioner's claim refused to review it on the merits because the petitioner failed to comply with the rule and the state court's refusal was consistent with other decisions). Importantly, the Supreme Court recently held:

> [A] discretionary state procedural rule can serve as an adequate ground to bar federal habeas review. Nothing inherent in such a rule renders it inadequate for purposes of the adequate state ground doctrine. To the contrary, a discretionary rule can be "firmly established" and "regularly followed" – even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others. *See* Meltzer, State Court Forfeitures of Federal Rights, 99 Harv. L. Rev. 1128, 1140 (1986) ("[R]efusals to exercise discretion do not form an important independent category under the inadequate state ground doctrine").
>
> A contrary holding would pose an unnecessary dilemma for the States: States could preserve flexibility by granting courts discretion to excuse procedural errors, but only at the cost of undermining the finality of state court judgments. Or States could preserve the finality of their judgments by withholding such discretion, but only at the cost of precluding any flexibility in applying the rules.

Beard v. Kindler, 130 S. Ct. 612, 618 (2009). The state rule at issue here qualifies as "adequate" because, although it appears it may have been discretionary, it was firmly established and regularly followed in non-capital cases at the time Petitioner's default occurred. *See*, *e.g.*, Commonwealth v. Poplawski, 852 A.2d 323, 326 n.3 (Pa. Super. 2004); Commonwealth v. Adrulewicz, 911 A.2d 162, 164 n.7 (Pa. Super. 2006); Commonwealth v. Jarowecki, 923 A.2d 425, 428 (Pa. Super. 2007), *reversed on other grounds*, 985 A.2d 955 (Pa. 2009). Hence,

Petitioner's waiver under state law constitutes a procedural default for purposes of seeking federal habeas relief.

Despite this procedural default, Petitioner has not demonstrated that his counsel was ineffective for failing to object to the evidence that Petitioner claims violated the Pennsylvania Rules of Evidence. To prove ineffective assistance, Petitioner must show that (1) his counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 686 (1984). To show prejudice, Petitioner must demonstrate that the ineffective assistance of counsel actually had an adverse effect on the defense such that the result of the proceeding would have been different but for counsel's errors. Id. at 693-94. Here, the evidence Petitioner claims was improperly admitted under Pa. R.E. 404(b)(1) appears to be the testimony of Cochran and other persons about a prior car-jacking, robbery of a drug dealer, or drug activity in which he engaged. This evidence, however, was part of the history of the crimes – both preceding and subsequent to the commission of the offenses – and was also relevant to show motive. Therefore, it was admissible under Pa. R.E. 404(b)(2). For this reason, trial counsel was not ineffective in failing to object to its admission.

### 3. Instruction on Prior Inconsistent Statements

In claim 1(c), Petitioner claims that the trial court gave an incomplete jury instruction on prior inconsistent statements. The PCRA court addressed this claim in its Pa. R.A.P. 1925(a) Opinion as follows:

> Stringer next maintains that this Court erred in instructing the jury that it could only consider the prior statements of witnesses for the purpose of establishing their credibility at the time of trial and those prior statements could not be used as substantive evidence. Even if this instruction was an error, it was harmless error since the evidence presented in this case was overwhelming that Stringer committed the crimes for which he was charged. In addition, the declarants admitted they made some or all of the inconsistent statements and

Stringer's co-defendant, Cochran, explained that her inconsistent statements were made to protect Stringer.

(Rep't Ex. 34, ECF No. 34-2 at pp.21-23.)  On appeal, the Superior Court agreed that "any consequence resulting from the potentially defective jury instruction [was] harmless."  (Rept's Ex. 39, ECF No. 34-6 at pp.24-26.)

Petitioner argues that, had the jury been able to consider as substantive evidence Cochran's prior inconsistent statement where she told police that Petitioner was a drug dealer, the jury could have believed that he was selling drugs to Mr. Lynch and, while the drug deal was taking place, Mr. Lynch made a homosexual comment and advance, which caused Petitioner to flashback to when he was abused as a child and then kill Mr. Lynch who he unreasonably believed to be the individual who had abused him.

As hinted at in the PCRA court's Opinion, prior inconsistent statements are admissible in Pennsylvania as substantive evidence if recorded, made under penalty of perjury, or in writing and signed and adopted by a declarant.  Pa. R.E. 803.1(1) (Inconsistent Statement of Witness). However, in this case, the trial judge instructed the jury on the use of prior statements of witnesses as follows:

> Now, you also heard evidence that some of the witnesses made statements that were inconsistent with their testimony at the time of trial.  These prior inconsistent statements are given to you for the sole purpose of making a determination as to whether or not the testimony that has been given at the time of the trial is credible.  You would consider those prior inconsistent statements for that reason and that reason only to assess their particular credibility.

(July 9-10, 2005 Jury Trial tr. at 396).

In such a situation where the trial court errs by instructing the jury to consider a prior inconsistent statement only for impeachment purposes, the error can be considered harmless if

the court finds that the error did not prejudice the defendant. *See* Commonwealth v. Bird, 597 A.2d 1169, 1170-71 (1991). This is exactly what happened in this case.

As previously discussed in connection with Petitioner's claims regarding the trial court's refusal to give a voluntary manslaughter jury instruction, "[h]abeas relief for a due process violation concerning an absent or defective jury instruction is available only when the absence of an instruction, or a defective instruction, infects the entire trial with unfairness." Albrecht v. Horn, 485 F.3d 103, 129 (3d Cir. 2008) (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)). "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154 (1977).

Petitioner has not demonstrated that the error at issue infected his entire trial with unfairness. As Respondents' point out, there was nothing in Cochran's prior statements, or in her trial testimony, that had any bearing on the interaction Petitioner claims occurred between himself and Mr. Lynch. The state court's conclusion that it was harmless error for the trial court to fail to instruct the jury that they could utilize Cochran's prior statements as substantive evidence was neither clearly contrary to nor an unreasonable application of clearly established Federal law as determined by the Supreme Court, nor was it an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). As such, this claim does not entitle Petitioner to habeas relief.

### 4. **Hearsay Evidence**

In claim 1(d), Petitioner claims that he was denied a fair trial because hearsay evidence was admitted against him in violation of Pa. R.E. 803, specifically the testimony of Detective Tallent who used a report prepared by Officer Wolfson to refresh his recollection.

The PCRA court addressed this claim in its Pa. R.A.P. 1925(a) Opinion as follows:

> Detective Tallent was testifying from his memory . . . he needed to refer to the police report to refresh his recollection with respect to questions that were being asked of him by Stringer's counsel. It should be noted that the police reports were never admitted into evidence nor were they ever given to the jury. Pennsylvania Rule of Evidence 612(a) permits an individual to use a writing or other item to refresh their recollection with respect to the testimony that they are presenting at the time of trial. . . . The testimony that was presented by Detective Tallent was not hearsay statements from the report prepared by another individual but, rather, Detective Tallent's testimony once his memory was refreshed.

(Resp't Ex. 34, ECF No. 34-2 at pp.20-21.)

Like claim 2(b), this claim is also unexhausted and procedurally defaulted for Petitioner's failure to include and argue it in his Appellant Brief on appeal from the denial of PCRA relief. However, like claim 1(b), the claim itself would not be cognizable in this federal habeas corpus proceeding even if it were not procedurally barred because the admissibility of evidence under the Pa. R.E. is a state law question which a federal habeas court cannot reexamine. *See* Estelle, 502 U.S. at 67-68.

In addition to its procedural bar, this claim is baseless. The police report that was prepared by Officer Wolfson was not admitted into evidence and Officer Tallent did not testify to the contents of the report. Instead, the report was used to refresh Officer Tallent's memory of events, which was permissible under Pa. R.E. 612. While Petitioner's trial counsel asked Officer Tallent if the report was accurate and, in receiving an affirmative answer, impeached Officer Tallent with a specific inconsistency between his testimony and the report, the particular matter

in the report of which the inquiry was made did not come in as substantive evidence and only served the defense purpose of discrediting a witness testifying against Petitioner. Therefore, the violation as alleged by Petitioner did not occur.

### 5. **Defective Criminal Information**

In claim 2(c), Petitioner claims that counsel was ineffective in failing to quash the Criminal Information, which he claims did not comply with Pennsylvania Rule of Criminal Procedure 560 and 42 Pa. C.S. § 8931. In claim 4(a), Petitioner claims that the court lacked subject matter jurisdiction to try him because of the aforementioned defect, and in claim 2(d), Petitioner claims that trial counsel was ineffective for failing to object to this lack of subject matter jurisdiction.

First, this claim is unexhausted and procedurally defaulted because it was never presented to the state courts. Second, this claim is based on state law error which is not grounds for relief in a federal habeas proceeding. *See* <u>Estelle</u>, 502 U.S. at 67-68. Third, both Criminal Informations are in full compliance with the requirements of the applicable Pennsylvania Rules of Criminal Procedure.[17]

---

[17] Petitioner claims that the Criminal Informations are defective because neither contains the initials of the assistant district attorney next to the rubber stamp signature of the district attorney. However, in Pennsylvania, a criminal information need only be signed by an attorney for the Commonwealth. An attorney for the Commonwealth is defined as "the acting district attorney and any assistant district attorney whose authority to act for the district attorney . . . is evidenced by a written designation executed by the district attorney . . . and filed with the clerk of courts." 42 Pa. C.S.A. § 8931(i). Further, the Pennsylvania Supreme Court has held that a rubber-stamped information has the same presumption of validity as a manually signed information. <u>Commonwealth v. Emanuel</u>, 462 A.2d 653, 654 (1983).

Petitioner also claims that the Information charging him with criminal homicide is defective because it did not contain a plain or concise statement of the essential elements of murder, did not give notice of the required malice element, and did not specify the degree of murder. However, in Pennsylvania a criminal information may charge criminal homicide generally and is

## 6.  Lack of Grand Jury Proceedings

In claims 2(d) and 4(b), Petitioner claims that the Court of Common Pleas of Allegheny County did not have jurisdiction because his case was not presented to a grand jury and trial counsel was ineffective for failing to raise this claim.  Like the previous claim, these claims are unexhausted and procedurally defaulted because they were never presented to the state courts. Additionally, claim 2(b) is meritless because the requirement of a grand jury indictment under the Fifth Amendment to the United States Constitution has not been extended to the states through the Due Process Clause of the Fourteen Amendment to the United States Constitution. Alexander v. Louisiana, 405 U.S. 625, 633 (1972) ("[T]he [Supreme] Court has never held that federal concepts of a 'grand jury,' . . . are obligatory for the States.") (citing Hurtado v. California, 110 U.S. 516, 538 (1884)).  Furthermore, because no such right exist, trial counsel was not ineffective for failing to raise this claim.  See Werts, 228 F.3d at 203 ("counsel cannot be deemed ineffective for failing to raise a meritless claim.")

## 7.  Pennsylvania's Criminal Homicide Statute

In claim 3, Petitioner claims that Pennsylvania's statutory scheme for Criminal Homicide is unconstitutional because it fails to contain, define, or give notice of malice.  In claim 4(c), Petitioner claims that the trial court lacked subject matter jurisdiction because of the aforementioned constitutional defects in the statute.

---

not required to specifically state the charge of murder in order for a defendant to be aware that he faced that charge.  See Commonwealth v. Glass, 434 A.2d 707, 712 (Pa. 1981) (citing Commonwealth v. Garcia, 378 A.2d 1199 (Pa. 1977) and Commonwealth v. Polimeni, 378 A.2d 1189 (Pa. 1977)).  See also Commonwealth v. Chambers, 852 A.2d 1197 (Pa. Super. 2004). Petitioner's argument regarding malice is addressed in section 2.D.7 of this Report and Recommendation.

First, this claim was never raised in the state courts.  Therefore, it is unexhausted and procedurally defaulted.  However, Petitioner's claim is without merit because the *mens rea* for first degree murder is set forth in 18 Pa. C.S.A. § 2502(a), an "intentional killing," and an "intentional killing" is defined in the statute as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing[,]" id. at § 2502(d).  The intent which is a prerequisite to a finding of murder is "malice aforethought" or simply, malice.  Commonwealth v. Weinstein, 451 A.2d 1344 (Pa. 1982).  In Pennsylvania, malice consists either of "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty," indicating unjustified disregard for the probability of death or great bodily harm.  Commonwealth v. Drum, 58 Pa. 9, 15 (Pa. 1868).  Despite Petitioner's argument, the failure to define malice in the statute does not render the statute unconstitutional.  Pennsylvania still follows the common law definition of murder, and "the common law of murder is well enough defined after centuries of application" that the failure to define malice does not render the statute unconstitutionally vague.  *See* United States ex rel. Almeida v. Rundle, 383 F.2d 421, 426 (3d Cir. 1967) (upholding former felony-murder statute).  Accordingly, this claim does not entitle Petitioner to habeas relief.

### 8.  **Miller v. Alabama**

In claim 5,[18] Petitioner claims that he is entitled to relief under Miller v. Alabama, 132 S. Ct. 2469 (2012), which held that mandatory life sentences without the possibility of parole for those under the age of 18 at the time of their crimes violate the Eighth Amendment.  Petitioner raised this claim in his second PCRA petition, but the PCRA court found that Miller was not applicable to Petitioner because he was twenty years old at the time he committed the homicide.

---

[18] Petitioner raised claim 5 in his supplement filed on March 31, 2014.  (ECF No. 14.)

(Resp't Ex. 54; ECF No. 35-7 at pp.8-17.)  The Pennsylvania Superior Court affirmed the denial of PCRA relief.  (Resp't Ex. 58; ECF No. 36-2 at pp.1-5.)

It is undisputed that Petitioner was over the age of 18 at the time he committed the underlying offenses and therefore the protections in <u>Miller</u> do not extend to him.  Petitioner argues that <u>Miller</u> should apply to those individuals under the age of 21 because Pennsylvania has defined an adult as those 21 years or older, 1 Pa. C.S.A. § 1991.  "However, the Supreme Court's holding in <u>Miller</u> was not based on whether a defendant is considered a 'minor' under state law, but rather clearly applied to those under 18 at the time of the crime."  <u>Williams v. Folino</u>, 2015 WL 3755097, at *4 (E.D. Pa June 16, 2015) (citing <u>Miller</u>, 132 S. Ct. at 2460)).  As such, this claim does not entitle Petitioner to habeas relief.

### 9.  <u>Lack of Subject Matter Jurisdiction</u>

In claim 6,[19] Petitioner claims that he was improperly tried and sentenced under 18 Pa. C.S.A. § 2501, 18 Pa. C.S.A. § 1102(a), and 42 Pa. C.S.A. § 9711, without subject matter jurisdiction in violation of procedural and substantive due process  of the Fourteenth Amendment and notice requirements of the Sixth Amendment.  Petitioner concedes that this claim is unexhausted and procedurally defaulted because he did not raise it in the state courts. Therefore, it is not subject to habeas review.  In addition, this claim is simply without merit.  Pennsylvania's sentencing procedure for murder of the first degree, 42 Pa. C.S.A. § 9711, in combination with 18 Pa. C.S.A. § 1102 and 42 Pa. C.S.A. § 9756, provides the authority under which a sentence of life imprisonment shall be imposed on one who has been convicted of first degree murder. Accordingly, this claim does not provide him with habeas relief.

---

[19] Petitioner raised claim 6 in his supplement filed on October 3, 2014.  (ECF No. 44.)

### E. Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. As provided for in 28 U.S.C. § 2253, "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner has not made the requisite showing in these circumstances. Accordingly, a certificate of appealability should be denied.

### III. CONCLUSION

For the reasons that follow, it is respectfully recommended that the Petition for Writ of Habeas Corpus (ECF No. 12) be denied and that a Certificate of Appealability also be denied.

In accordance with the applicable provisions of the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B)&(C), and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen (14) days from the date of the service of this report and recommendation to file written

objections thereto.  Any party opposing such objections shall have fourteen (14) days from the date on which the objections are served to file its response.  A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

     Dated:  February 1, 2016

_____
Lisa Pupo Lenihan
United States Magistrate Judge


Cc:  Robert Stringer
    GH1592
    175 Progress Dr.
    Waynesburg, PA  15370